933 F.2d 131
 32 Fed. R. Evid. Serv. 1218
 WM. PASSALACQUA BUILDERS, INC., and Safeco Insurance Company
of America and General Insurance Company of
America, Plaintiffs-Appellants, Cross-Appellees,
v.
RESNICK DEVELOPERS SOUTH, INC., Jack Resnick, Burton
Resnick, 90079, Inc., Jack Resnick & Sons, Inc., Sunrise
Builders, Inc., Jack Resnick & Sons of Florida, Inc.,
Resnick of Boca, Inc., JFAM Investments, Inc., Resnick
Development Corporation, Pearl Resnick, Judith Resnick, Ira
Resnick, Marilyn Katz, Stanley Katz, Susan Abrams, John Doe,
John Does, Inc., Defendants-Appellees, Cross-Appellants.
 Nos. 526, 536, Dockets 90-7558, 90-7598.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 26, 1990.
Decided May 14, 1991.
 
 David J. Larson, Atlanta, Ga. (Peterson, Dillard, Young, Self & Asselin, Atlanta, Ga., of counsel), Frank J. Franzino, New York City (Bryan, Levitan, Franzino & Rosenberg, New York City, of counsel), for appellants Wm. Passalacqua Builders, Inc., et al.
 Brian Gallagher, New York City (Kronish, Lieb, Weiner & Hellman, New York City, of counsel), for defendants-appellees and cross-appellants other than Resnick Developers South, Inc.
 Before OAKES, Chief Judge, and CARDAMONE and McLAUGHLIN, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Nearly 20 years ago plaintiffs entered into a contract to build a hotel in Florida for defendant, Resnick Developers South, Inc. (Developers). Since then the real estate deal has gone sour, demands for payments for labor and services remain outstanding, and a judgment brought to collect the money owed plaintiffs still is unsatisfied. In their suit before the district court plaintiffs attempted to prove defendant was a "shell" corporation, the alter ego of other family-owned corporations or its individual stockholders. The purpose of the suit was to pierce defendant's corporate veil and to reach the assets of the real contracting parties; in this objective, plaintiffs failed.
 
 
 2
 But because the district court misconstrued the case law on this subject--causing it to grant improperly directed verdicts as to a majority of the defendants and to instruct improperly the jury--we remand the matter with instructions to hold a new trial. In doing so, we also review certain of the district court's prior rulings made on the long and tortuous road this case has taken.
 
 BACKGROUND
 
 3
 The facts are essentially undisputed and were the subject of extensive stipulations in the district court. Plaintiffs William Passalacqua Builders, Inc. (Passalacqua), Safeco Insurance Co. of America (Safeco), and General Insurance Co. of America (General Insurance) are respectively, a building contractor and the assignees of the rights under a contract, the breach of which is the genesis of the instant litigation. Defendants Developers, 90079, Inc., Jack Resnick and Sons, Inc., Sunrise Builders, Inc., Jack Resnick & Sons of Florida, Inc., Resnick of Boca, Inc., PJFAM Investments, Inc., and Resnick Development Corporation are corporate entities controlled entirely (with the exception of Boca) by members of the Resnick family or by other corporations controlled entirely by them, and defendants Jack Resnick, Burton Resnick, Pearl Resnick, Judith Resnick, Ira Resnick, Marilyn Katz, Stanley Katz, and Susan Abrams are members of that family by blood or marriage with extensive involvement in some or all of the family of Resnick corporations.
 
 
 4
 On October 23, 1972 plaintiff Passalacqua entered into a contract with defendant Resnick Developers South, Inc. to construct a project in Florida known as the Mayfair House. Disputes arose during construction and attempts to negotiate a price for the extra work needed to complete the contract were unable to be resolved. Passalacqua sought arbitration in 1974 and obtained an award upon which a final judgment was entered in Florida in 1981 in the amount of $1,721,171 for damages caused by Developers' breach of contract. Prior to entry of judgment, Passalacqua assigned its right to enforce the judgment to Safeco. Only $769,989.10 of the judgment was recovered by Safeco (under a mechanics lien replaced by a bond guaranteed by Jack and Burton Resnick) leaving a balance of $951,181.90 unpaid.
 
 
 5
 Following their inability to recover fully on the judgment against Developers, Safeco and General Insurance instituted the instant action in the United States District Court for the Southern District of New York in a complaint containing four counts: two for equitable relief seeking to pierce the corporate veil (counts I and II), one for fraud (count III), and one alleging an oral guarantee by one of the defendants to pay the sum owed (count IV). A number of the district court rulings prior to trial are raised as issues on this appeal. By order of February 8, 1984 the district court (Edelstein, J.) dismissed count IV on statute of limitations grounds, the alleged oral promise having been made more than six years previously, and also dismissed certain defendants under count III. This ruling was not appealed. By order of May 16, 1985 the same district court dismissed the fraud count III in its entirety based on its conclusion that Passalacqua was a non-diverse plaintiff, in that it was an inactive corporation that had its principal place of business in Florida--where it last transacted business--as opposed to Ohio, its state of incorporation. Because Passalacqua was an indispensable party to count III, its absence from the action compelled dismissal of the fraud count. William Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 608 F.Supp. 1261, 1263-64 (S.D.N.Y.1985).
 
 
 6
 The district court ordered counts I and II--alleging that the defendants were liable under the equitable instrumentality or an alter ego theory of piercing the corporate veil--consolidated into a new amended complaint upon which the trial was held. Id. at 1265. It also ruled that it had jurisdiction over the alleged "alter ego" defendants, and declined to dismiss them on statute of limitations or jurisdictional grounds. Id. at 1264.
 
 
 7
 By order of July 12, 1985 the district court denied a motion to reargue this latter point, declined to certify the jurisdictional question for appellate review, and ordered sanctions against defendants under Rule 11 for filing what the court termed an "unnecessary motion" to dismiss the fourth amended complaint. William Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 611 F.Supp. 281, 285 (S.D.N.Y.1985). Finally, by order of April 25, 1988 it denied defendants' motion to strike the plaintiff's jury demand.
 
 
 8
 The case was then tried to a jury before Senior District Court Judge Pollack in the Southern District from May 1-3, 1990. At the close of plaintiff's case, the district court granted defendants' motion to dismiss all individual and corporate defendants except Developers and Jack Resnick and Sons, Inc. At the close of all the evidence, the trial court again reserved decision on the motion to dismiss as to Jack Resnick and Sons, and charged the jury. In a special verdict--using a form with questions supplied by the court--the jury found that Jack Resnick & Sons, Inc. was not the alter ego of Developers, and that Developers had conducted its own business for its own account. Judge Pollack then dismissed the remaining claims against all defendants, other than Developers, rendering the balance due on the 1981 judgment uncollectible. From the district court's judgment entered on May 3, 1990, plaintiffs appeal. Defendants cross-appeal from Judge Edelstein's grant of sanctions against them and contend he ruled incorrectly on several other issues, which we later discuss.
 
 DISCUSSION
 I History of Jury Trial Right
 
 9
 In deciding to try this case to a jury, the district court followed language from our opinion in American Protein Corp. v. AB Volvo, 844 F.2d 56, 59 (2d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988), in which we held "the issue of corporate disregard is generally submitted to the jury." Id. Because we have never addressed whether a right to a jury trial exists in a case where a judgment-creditor seeks to pierce the corporate veil and enforce a judgment--obtained against a subsidiary--against the parent corporation or individual shareholders alleged to have controlled the subsidiary, we revisit this area.
 
 
 10
 The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. The jury trial right includes more than the common-law forms of action recognized in 1791; the phrase "Suits at common law" refers to "suits in which legal rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognised [sic], and equitable remedies were administered." Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830) (Story, J.).
 
 
 11
 It is irrelevant whether the action actually existed in England in 1791 "for that Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty." Pernell v. Southall Realty, 416 U.S. 363, 375, 94 S.Ct. 1723, 1729, 40 L.Ed.2d 198 (1974); Curtis v. Loether, 415 U.S. 189, 195, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974). In determining whether a particular action is one at law or in equity, it is necessary to examine "both the nature of the issues involved and the remedy sought." Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 110 S.Ct. 1339, 1345, 108 L.Ed.2d 519 (1990). "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." Tull v. United States, 481 U.S. 412, 417-18, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987). The second inquiry is more important than the first. See Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 42, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989).
 
 
 12
 Applying this analysis is difficult because courts and commentators rarely address the historic origins of the piercing doctrine at length. Some believe its origin is equitable. See Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974) ("[T]he corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy.... In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."); United States v. Golden Acres, Inc., 684 F.Supp. 96, 103 (D.Del.1988) ("Piercing the corporate veil is an action that sounds in equity."), aff'd sub nom., Golden Acres, Inc. v. Sutton Place Corp., 879 F.2d 857 (3d Cir.1989); Fletcher, Cyc. Corp. Sec. 41 (1990 perm. ed.) ("Since the doctrine of piercing the corporate veil is an equitable one that is particularly within the province of the trial court, the right to a jury trial on the issue of piercing the corporate veil does not exist.").
 
 
 13
 Other courts conclude disregarding the corporate form is of legal origin or so touches on the determination of legal issues that it is for the jury to decide. See American Protein, 844 F.2d at 59 ("the issue of corporate disregard is generally submitted to the jury"); FMC Fin. Corp. v. Murphree, 632 F.2d 413, 421 n. 5 (5th Cir.1980) ("This Court holds that the issue of corporate entity disregard is one for the jury."). And at least one early scholar has noted that, whatever its origin, the doctrine has been applied in courts both of law and equity. See Wormser, I.M., Piercing the Veil of the Corporate Entity, 12 Colum.L.Rev. 496, 497-99, 513-14 (1912) ("courts, whether of law, of equity or of bankruptcy, do not hesitate to penetrate the veil and to look beyond the juristic entity at the actual and substantial beneficiaries.").
 
 
 14
 The latter view appears to have the greatest historical support. According to Professor Phillip Blumberg, enforcement of shareholder liability for corporate obligations began as "a crude system in which any creditor with an unsatisfied judgment against the corporation sued any shareholder at common law." Blumberg, The Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations Sec. 2.02, at 52 (1987) (Blumberg, The Law of Corporate Groups ); cf. Widdrington v. Cudworth and Others, (1662) Vidian's Exact Pleader, p. 3 (plaintiff who brought action in tort at common law claiming conspiracy to eject a fellow from Cambridge college, sued the fellows as a combination of individuals rather than the college as a corporation) (cited in Baker, An Introduction to English Legal History 524 (3d ed. 1990)).
 
 
 15
 The next stage in the evolution of this theory of disregard was the development of the equitable procedure known as a "creditor's bill." When fully formed, the creditor's bill had two parts. The first part was a proceeding in equity "instituted by any creditor with an unsatisfied judgment, usually on behalf of all creditors, against the corporate debtor," the purpose of which was to adjudge the extent of the total corporate liability to the group of creditors. Blumberg, The Law of Corporate Groups Sec. 2.02 at 53. The second part was an action at common law against the shareholders individually to collect the amount owed in which only personal defenses were allowed to be raised. See Abbot, Conflict of Laws and the Enforcement of the Statutory Liability of Stockholders in a Foreign Corporation, 23 Harv.L.Rev. 37, 43-45 (1909); Restatement (Second) of the Conflict of Laws Sec. 308, comment e (1971). These sources support the proposition that the nature of the ancient action disregarding the corporate form had equitable and legal components. Having examined the way this issue was treated historically, we turn next to examine the remedy sought.
 
 
 16
 Plaintiffs here seek enforcement of a money judgment obtained against Developers. The fact that plaintiffs seek money indicates a legal action. See Pernell, 416 U.S. at 370, 94 S.Ct. at 1727 (" 'where an action is simply for the recovery ... of a money judgment, the action is one at law' ") (quoting Whitehead v. Shattuck, 138 U.S. 146, 151, 11 S.Ct. 276, 277, 34 L.Ed. 873 (1891)); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 476, 82 S.Ct. 894, 899, 8 L.Ed.2d 44 (1962) (Insofar as complaint requests a money judgment "it presents a claim which is unquestionably legal").
 
 
 17
 Defendants contend that because plaintiffs have already secured a money judgment against Developers, their claim for money is merely incidental to their equitable piercing claim and, like disgorgement, does not require a jury trial. See SEC v. Tome, 833 F.2d 1086, 1096 n. 7 (2d Cir.1987), cert. denied, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 95-96 (2d Cir.1978). We disagree. As just discussed, the action for piercing the corporate veil does not sound solely in equity. Further, while it is true that "[t]he right to a jury trial depends on the nature of the relief sought, not on what may ultimately be secured," Damsky v. Zavatt, 289 F.2d 46, 56 (2d Cir.1961), the nature of the relief sought in the instant case is relief typically achieved in an action at law. Plaintiffs seek to establish defendants' liability for the judgment already obtained against Developers. This is analogous to the second phase of the old creditors' bill procedure in which the creditors, having obtained a judgment against the corporation in equity, then enforced that judgment against the individual stockholders at law.
 
 
 18
 Because the action for piercing the corporate veil appears to have its roots in both law and equity, and the nature of the relief sought here supports the conclusion that plaintiff's cause of action is legal in nature, it was entirely proper for the district court to submit the corporate disregard issue to the jury. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11, 79 S.Ct. 948, 956-57, 3 L.Ed.2d 988 (1959) (" '[jury] right cannot ... be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency' ") (quoting Scott v. Neely, 140 U.S. 106, 109-10, 11 S.Ct. 712, 714, 35 L.Ed. 358 (1891)); cf. Ross v. Bernhard, 396 U.S. 531, 538, 542-43, 90 S.Ct. 733, 738, 740-41, 24 L.Ed.2d 729 (1970) (finding a right to jury trial in a shareholder's derivative suit, a type of suit traditionally brought in courts of equity, because plaintiffs' case presented legal issues of breach of contract and negligence).
 
 
 19
 Moreover, as a practical matter separate from Seventh Amendment considerations, whether or not those factors--discussed later in our analysis--that will justify ignoring the corporate form and imposing liability on affiliated corporations or shareholders are present in a given case is the sort of determination usually made by a jury because it is so fact specific. See Blumberg, The Law of Corporate Groups Sec. 7.02.2, at 144.
 
 II The Directed Verdict
 A. Choice of Law
 
 20
 Because this is a diversity case, we apply the choice of law rules of the forum state, in this instance New York. Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir.1981). Choice of law issues involving contractual disputes are resolved in New York by an "interest analysis." See Intercontinental Planning Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969); see also Hutner v. Greene, 734 F.2d 896, 899 (2d Cir.1984), and therefore "the law of the jurisdiction having the greatest interest in the litigation" controls. See Daystrom, 24 N.Y.2d at 382, 300 N.Y.S.2d 817, 248 N.E.2d 576. In performing this analysis, we would ordinarily look to factors such as the place of: (1) contracting, (2) negotiation of the contract, (3) performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. See State Trading v. Assuranceforeningen Skuld, 921 F.2d 409, 417 (2d Cir.1990); Restatement (Second) of Conflict of Laws Sec. 188(2) (1971).
 
 
 21
 But, in the instant case the parties have assumed from the outset that New York law governs, as evidenced, for example, by reliance on New York law to support their respective contentions. See Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir.1984) (under New York law, "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied"). Further, the law in Florida--the only other state with significant contacts to this dispute--on corporate disregard is virtually identical to New York law. See Bendix Home Systems, Inc. v. Hurston Enterprises, Inc., 566 F.2d 1039 (5th Cir.1978). Thus, though the record is silent on whether the parties bargained for application of New York law, we conclude a New York court would apply New York law to the contract at issue here.
 
 B. New York Law
 
 22
 We now consider the district court's granting of a directed verdict dismissing all individual and corporate defendants, except Developers and Jack Resnick and Sons, Inc., at the close of plaintiffs' case. Plaintiffs assert that dismissal should not have been granted for the corporate defendants and in favor of individual defendants Jack Resnick, Burton Resnick and Stanley Katz, conceding this relief's appropriateness with respect to Boca, and individual defendants Pearl, Judith, and Ira Resnick, Marilyn Katz, and Susan Abrams. In order to decide whether the district court properly granted dismissal in favor of the defendants named, we must analyze the requirements for disregarding the corporate form under New York law, and then determine whether the district court correctly applied those requirements to the facts of this case.
 
 
 23
 New York's view on this subject begins with Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58 (1926), where Judge Cardozo said:
 
 
 24
 Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent.... The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, ... where the attempted separation between parent and subsidiary will work a fraud upon the law.
 
 
 25
 Id. at 95, 155 N.E. 58.
 
 
 26
 Ten years later Lowendahl v. Baltimore & Ohio R.R. Co., 247 A.D. 144, 287 N.Y.S. 62 (1st Dept.), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936), set forth the New York rule for corporate disregard. Lowendahl took Berkey 's proposition as a starting point, and proceeded to explain that to pierce the corporate veil, the parent corporation must at the time of the transaction complained of: (1) have exercised such control that the subsidiary "has become a mere instrumentality" of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff. Id. 247 A.D. at 157, 287 N.Y.S. 62. The doctrine, it was said, is invoked "to prevent fraud or to achieve equity." International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249 (1948). Professor Blumberg believes--and we agree--that the three-factor rule in New York and the alter ego theory sued on in this case are indistinguishable, do not lead to different results, and should be treated as interchangeable. See Blumberg, The Law of Corporate Groups Sec. 6.-03 at 120.
 
 
 27
 Under New York law it has been further held that when a corporation is used by an individual to accomplish his own and not the corporation's business, such a controlling shareholder may be held liable for the corporation's commercial dealings as well as for its negligent acts. See Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966). Where there is proof that defendants were doing business in their individual capacities to suit their own ends--shuttling their own funds in and out without regard to the corporation's form--this sort of activity exceeds the limits of the privilege of doing business in a corporate form and warrants the imposition of liability on individual stockholders. Id. at 420, 276 N.Y.S.2d 585, 223 N.E.2d 6. The critical question is whether the corporation is a "shell" being used by the individual shareowners to advance their own "purely personal rather than corporate ends." Port Chester Elec. Constr. Corp. v. Atlas, 40 N.Y.2d 652, 656-57, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976) (quoting Walkovszky, 18 N.Y.2d at 418, 276 N.Y.S.2d 585, 223 N.E.2d 6).
 
 
 28
 We capsulized this view of New York law in American Protein, 844 F.2d 56 (2d Cir.1988), where we observed that control, whether of the subsidiaries by the parent or the corporation by its stockholders, is the key; the control must be used to commit a fraud or other wrong that causes plaintiff's loss. Id. at 60. See Electronic Switching Indus., Inc. v. Faradyne Elec. Corp., 833 F.2d 418, 424 (2d Cir.1987) (absent a showing that "control and domination was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act" New York law will not allow a piercing of the corporate veil); Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir.1985) (same as American Protein ).
 
 
 29
 Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties. See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 703 (2d Cir.1990) ("New York law allows the corporate veil to be pierced either when there is fraud or when the corporation has been used as an alter ego.") (emphasis in original); Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir.1979) ("Because New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation ..., and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego."); cf. Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir.1980) (in federal maritime law "The prerequisites for piercing a corporate veil are ... clear ...: [the defendant] must have used [the corporation] to perpetrate a fraud or have so dominated and disregarded [the corporation's] corporate form that [the corporation] primarily transacted [the defendant's] personal business rather than its own corporate business.")
 
 
 30
 Plaintiffs assert that the Resnick corporations were one whole entity--that is, Developers was dominated by the other corporations--and that Developers was really the agent of the Resnick family members who used it to pursue their own ends. To determine whether these assertions are valid, the triers of fact are entitled to consider factors that would tend to show that defendant was a dominated corporation, such as: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. See generally, Barber, Piercing the Corporate Veil, 17 Willamette L.Rev. 371, 398 (1981); Director's Guild of America v. Garrison Prod., 733 F.Supp. 755, 760-61 (S.D.N.Y.1990); United States Barite Corp. v. M.V. Haris, 534 F.Supp. 328, 330 (S.D.N.Y.1982).
 
 
 31
 Applying these--or any other pertinent factors--to the infinite variety of situations that might warrant disregarding the corporate form is not an easy task because disregarding corporate separateness is a remedy that "differs with the circumstances of each case." American Protein, 844 F.2d at 60. The jury must decide whether--considering the totality of the evidence, see William Wrigley, Jr. Co. v. Waters, 890 F.2d 594, 601 (2d Cir.1989)--the policy behind the presumption of corporate independence and limited shareholder liability--encouragement of business development--is outweighed by the policy justifying disregarding the corporate form--the need to protect those who deal with the corporation. Blumberg, The Law of Corporate Groups Sec. 6.01, at 108 ("The particular objectives and policies of the area under consideration should control.").
 
 C. Review of the Present Record
 
 32
 The Resnick family real estate business consisted of various partnerships and corporations, all controlled either directly or indirectly by family members. Developers was set up specifically in April 1972 to develop real estate in Florida. Throughout its existence it did not establish and maintain corporate indicia. It did not issue its shares timely, it had no employees except its officers--many of whom were also the officers and employees of the other corporate defendants--and neither held regular meetings, nor elected officers and directors as required by its certificate of incorporation. At the same time, Developers had separate books--though they were kept by Jack Resnick & Sons, Inc.--maintained separate bank accounts, and filed separate tax returns (except when consolidated legally with other Resnick-controlled companies).
 
 
 33
 There was no evidence of any fraud by the Resnicks or any of the corporations they controlled, a fact plaintiffs concede. Yet, Developers was severely undercapitalized during the period the building contract was in effect, having only $10 in capital paid by 90079, Inc.--another Resnick-controlled entity--when it bought all of Developer's shares in 1973. All other funds available to Developers came in the form of loans, made initially by Resnick-controlled companies and eventually by Bankers Trust, the bank which agreed to fund the Mayfair House construction project. Bankers agreed to provide 100 percent financing in the form of a $9 million construction loan, secured only by a mortgage on the property and by the personal guarantees of completion by Jack and Burton Resnick. Personal guarantees of completion only bind a party to complete the project; by their plain terms they do not guarantee payment of amounts owed to contractors working on the project. Hence, completion guarantees do not constitute capital of the corporation available for its creditors. See Fletcher, Cyc. Corp. at Secs. 5079-5080.1 (defining "capital" of corporation).
 
 
 34
 Evidence also showed the lines of corporate control and responsibility among Resnick-controlled entities were often blurred. The Resnick corporations shared a common office in New York City, had the same office staff, and essentially the same officers and directors, albeit in different permutations and combinations. Burton Resnick, Jack Resnick, and Stanley Katz were officers of all the corporate defendants. Employees of one Resnick corporation were sometimes paid as though they actually worked for another corporation, and employees would represent to clients that they were an officer of one of the corporations when in fact they actually occupied that position in another Resnick corporation. For instance, Irving Katz was employed as treasurer of Jack Resnick & Sons, Inc., but he signed letters as the controller of Developers, even though he was not an employee or officer of that corporation.
 
 
 35
 Financial transactions also revealed a high degree of intermingling among the various corporate entities. The Resnicks shuffled funds from one to another of their corporations frequently with the source of the funds chosen based on which of their corporations had sufficient funds at the time, rather than on any demonstrated business purpose of the corporation that was the source of the funds. Interest was not generally charged by the corporation advancing money to another Resnick entity. Funds were shifted in this fashion into and out of Developers' bank accounts with regularity, but all such sums were duly noted in the corporate books and most loans from other Resnick-controlled corporations or individual family members were repaid. Other proof showed the Resnick corporations paid personal expenses of officers and employees in certain instances, and provided Resnick relatives with below-market deals on real estate.
 
 
 36
 In addition, the corporations did not deal at arms length with each other. For example, Burton Resnick testified that when Developers was purchased by 90079, Inc. for $10, he anticipated a three million dollar profit on the Mayfair House. Nor were the Resnick corporations treated as individual profit centers. Profit calculations were compiled that suggested that the distinctions between corporations were artificial, and it was actually the profit to the entire collection of Resnick-controlled corporations--as opposed to each separate entity--that was being calculated for the family to review.
 
 
 37
 Looking at these factors and considering the totality of the evidence, and drawing as we must all inferences favorably to the plaintiffs, Konik v. Champlain Valley Physicians Hospital Medical Center, 733 F.2d 1007, 1013 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), we think a jury could find a level of control that was substantial, and could be interpreted as sufficient domination to justify piercing the corporate veil to reach the assets of either the individual Resnick family members or the other Resnick-controlled corporate entities. Under New York law there was therefore enough evidence to allow this case to go to the jury with respect to all the corporate defendants, except Boca, and with respect to the individual defendants Jack Resnick, Burton Resnick, and Stanley Katz. Because the district court granted a directed verdict dismissing plaintiffs' complaint against these defendants, the case must therefore be remanded for a new trial.
 
 III The Jury Charge
 
 38
 Substantially the same reasons that lead us to reverse the district court's directed verdict as to a majority of the defendants also lead us to conclude the district court erred in its instructions to the jury on New York's disregard doctrine. First, the court instructed the jury that piercing the corporate veil "is an equitable doctrine to prevent fraud or to deal with misrepresentation perpetrated by a contracting party. No fraud, no affirmative misrepresentation is charged against Jack Resnick & Sons, Inc. None of that is claimed to have occurred here." This instruction incorrectly instructed the jury that plaintiffs were required to prove fraud. New York law, as discussed, permits the corporate form to be disregarded where excessive control alone causes the complained of loss.
 
 
 39
 Second, the district court then proceeded to instruct the jury that it could consider whether proceeds from the sales of condominium units went to Jack Resnick & Sons, Inc., whether Developers was properly incorporated, maintained separate books, records and credit facilities, and properly filed tax returns. Concededly, these are some of the factors a jury may consider when deciding whether to disregard the corporate entity. But there was sufficient evidence to warrant instruction as to other factors, just discussed, regarding level of control. Plaintiffs properly preserved their objections to the count's charge. On remand, the trial court should instruct the jury with respect to these additional factors for its use in considering the piercing claim.
 
 IV Dismissal of Plaintiff Passalacqua
 
 40
 In dismissing Plaintiff Passalacqua from this lawsuit, Judge Edelstein correctly concluded that when a corporation has ceased business activity, diversity jurisdiction under 28 U.S.C. Sec. 1332(c) is determined not only by its state of incorporation, but also by the place it last transacted business, here Florida. William Passalacqua Builders, Inc., 608 F.Supp. at 1263. Both the state of incorporation and the principal place of business should be considered in deciding whether diversity jurisdiction is present. To allow inactive corporations to avoid inquiry into where they were last active would give them a benefit Congress never planned for them, since under such a rule a defunct corporation, no matter how local in character, could remove a case to federal court based on its state of incorporation.
 
 
 41
 In Fada of New York, Inc. v. Organization Serv. Co., 125 F.2d 120, 121 (2d Cir.1942) (per curiam), we rejected the argument of a bankrupt that the district court lacked jurisdiction because New York was not a place of business at least six months preceding the filing of the bankruptcy petition. Because New York had been a principal place of business, we ruled that the bankruptcy petition had been properly filed in New York. Id. Fada is particularly instructive because the bankruptcy laws in effect at that time provided for jurisdiction either in the place of the corporation's domicile or in its principal place of business, and Congress amended Sec. 1332(c) to follow these provisions in the bankruptcy laws. See S.Rep. No. 1830, 85th Cong. 2d Sess. 5 (1958), reprinted in 1958 U.S.Code Cong. & Admin. News 3099, 3102; Friedenthal, New Limitations on Federal Jurisdiction, 11 Stan.L.Rev. 213, 222-25 (1959). Thus, the district court properly ruled that the place an inactive corporation last transacted business is relevant in determining diversity jurisdiction.
 
 
 42
 There also was ample evidence supporting the conclusion that Florida was Passalacqua's last principal place of business. It obviously transacted business there as evidenced by the activities which gave rise to this litigation. Further, at the time this lawsuit was filed in 1982, its corporate charter had lapsed in Ohio, but it was still a corporation in good standing in Florida. Hence, we agree with the district court that Passalacqua is a non-diverse plaintiff that should have been dismissed from the action. Yet, because Passalacqua is not indispensable to resolution of the remaining claims against defendants, Fed.R.Civ.P. 19(b) does not require that the entire complaint be dismissed.
 
 
 43
 V Evidentiary Ruling Barring Passalacqua's Testimony
 
 
 44
 During the course of the trial, the trial court refused to allow plaintiffs' counsel to ask William Passalacqua--President of Passalacqua Builders and the man who had negotiated the contract with Developers--the following four questions:
 
 
 45
 [A]t the time that you signed that contract, were you aware of the financial structure of [Developers]?
 
 
 46
 Mr. Passalacqua, why didn't you ask for any personal guarantees of the Resnick ...?
 
 
 47
 Did you get any information about the Resnick organization in general before you signed that contract?
 
 
 48
 Did you have any understanding of what the financial strength was of the Resnick organization before you signed that contract?
 
 
 49
 The district court then charged the jury as follows:
 
 
 50
 One who deals with a corporation is entitled, and, indeed, obliged to do his own investigation of finances, if he is concerned with them--there is no proof here that Passalacqua was concerned--just as the one who deals with an individual is entitled and obliged to satisfy himself regarding the individual's financial health if that matter is considered significant.
 
 
 51
 The district court's decision to bar Passalacqua's testimony on the four questions at issue was prejudicial to plaintiffs in light of his instruction to construe Passalacqua's failure to investigate Developers finances against him. This was compounded by the charge to the jury on the issue of capitalization:
 
 
 52
 Capital of a corporation is of no substantial significance, where, as here, a bank was putting up a hundred percent of the money that's needed to build the project.... It is not permissible to disregard corporate form solely because of inadequate capitalization.
 
 
 53
 Contrary to the trial court's charge, the degree of capitalization of a subsidiary is clearly relevant to the piercing inquiry, see Fisser v. International Bank, 282 F.2d 231, 240 (2d Cir.1960), though the overall ability of the corporation to meet its obligations is obviously the more pertinent aspect of capitalization in that context. The charge on capitalization belittled its importance, a prejudicial error in light of the fact that Developers had only $10 in actual capital to meet its obligations, all other funds available for creditors being loans either from Bankers and other Resnick corporations.
 
 
 54
 Further, although it is true that knowledge of under-capitalization has been construed as a bar to inclusion of this factor for consideration in a piercing claim, Brunswick Corp. v. Waxman, 459 F.Supp. 1222, 1232 (E.D.N.Y.1978), aff'd, 599 F.2d 34 (2d Cir.1979), here the trial court instructed the jury that Passalacqua had such knowledge, after barring him from giving testimony as to what he actually knew about that subject. This was plainly prejudicial to plaintiffs and, while not grounds for reversal standing alone, we mention it in light of the directed remand.
 
 VI The Statute of Limitations
 
 55
 Defendants contend on their cross-appeal that Judge Edelstein erred when he ruled that jurisdiction existed over the alleged alter ego defendants in the action to enforce the judgment. William Passalacqua Builders, Inc., 608 F.Supp. at 1264 & n. 1; 611 F.Supp. at 284 n. 1. They claim, relying on the Supreme Court's opinion in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110-12, 89 S.Ct. 1562, 1569-70, 23 L.Ed.2d 129 (1969), that the action should have been dismissed as barred by the six-year statute of limitations for breach of contract claims. Defendants' reliance on Zenith is misplaced. In Zenith the Court held it unconstitutional for a court to enforce a judgment against a parent corporation--alleged to be the alter ego of a subsidiary--who had controlled the litigation against the subsidiary, but who had never been subjected to the personal jurisdiction of the court. What the defendants ignore is the statement in Zenith that the judgment against the subsidiary could be res judicata against the parent in a court, as the district court here, that did have proper jurisdiction over the parent. Id. at 111, 89 S.Ct. at 1570.
 
 
 56
 Consequently, if the plaintiffs in this case can prove the defendants are in fact the alter ego of Developers, defendants' jurisdictional objection evaporates because the previous judgment is then being enforced against entities who were, in essence, parties to the underlying dispute; the alter egos are treated as one entity. See Dudley v. Smith, 504 F.2d 979, 982-83 (5th Cir.1974). Assuming--as defendants concede--there was personal jurisdiction over the alter ego defendants, Judge Edelstein correctly refused to bar plaintiffs' claims on statute of limitations grounds.
 
 VII Sanctions
 
 57
 We turn now to the sanctions issue. In 1985 the defendants filed a motion to dismiss an amended complaint filed pursuant to the district court's order of May 16, 1985. William Passalacqua Builders, Inc., 611 F.Supp. at 285. According to the district court, plaintiffs' brief on this subject contained "the identical section on a motion for certification contained in the motion for reargument," filed the same day. Judge Edelstein concluded that this was "an unnecessary motion[,] ... clearly the type of abuse of motion practice that Rule 11 of the Federal Rules of Civil Procedure was intended to discourage," and awarded plaintiffs attorney's fees. Id. Although we share the district court's disdain for defendants' use of a recycled memorandum of law on their motion to dismiss the fourth amended complaint, the timing of defendants' motions were dictated by the local rules and the district court's order dismissing the third amended complaint. We do not think defendants' motion to dismiss the fourth amended complaint was filed for an improper purpose, see Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1005 (2d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988), and the district court did not find otherwise. Accordingly, we reverse as an abuse of discretion the order granting sanctions against defendants. Cooter & Gell v. Hartmarx Corp., --- U.S. ----, 110 S.Ct. 2447, 2460-61, 110 L.Ed.2d 359 (1990).
 
 
 58
 Finally, we have considered the other issues raised by the parties and find them to be without merit.
 
 CONCLUSION
 
 59
 Insofar as the trial court granted a directed verdict as to a majority of the defendants at the close of plaintiffs' case and granted a motion to dismiss as to most of the remaining defendants at the close of all the evidence, we reverse and remand for a new trial. The award of sanctions against defendants is reversed. In all other respects, the decisions of the two district courts are affirmed.
 
 
 60
 Affirmed, in part, reversed, in part, and remanded for a new trial.