**CARTE BLANCHE (SINGAPORE) PTE., LTD., Plaintiff–Appellant,**

**v.**

**DINERS CLUB INTERNATIONAL, INC., also known as Citicorp/Diners Club, Inc., also known as The Diners Club, Inc., and Carte Blanche International, Ltd., Defendants–Appellees.**

No. 1135, Docket 92–9125.

United States Court of Appeals, Second Circuit.

Argued May 14, 1993.

Decided Aug. 19, 1993.

---

Sheldon H. Elsen, Leslie A. Lupert, and Melissa A. Cohen, of counsel, Orans, Elsen & Lupert, William R. Hansen, of counsel, Nims, Howes, Collison, Hansen & Lackert, New York City, for ·plaintiff-appellant.

Steven J. Stein and Maryann Berger, Boulanger, Hicks, Stein & Churchill, New York City, for defendant-appellee Diners Club Intern., Inc.

Michelena Hallie and Christopher A. Fraser, Kay Collyer & Boose, New York City, for defendant-appellee Carte Blanche Intern., Ltd.

Before: PRATT and MINER, Circuit Judges, and JACOB MISHLER, District Judge of the Eastern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Plaintiff Carte Blanche (Singapore) Pte., Ltd. (CBS) appeals from the judgment dismissing its complaint after a nonjury trial. CBS had obtained an arbitration award against defendant Carte Blanche International, Ltd. (CBI), based on CBI's breach of a franchise agreement that authorized CBS to market and service Carte Blanche credit cards in Malaysia, Singapore, and Bruenei. Unable to collect from CBI, which had ceased operating by the end of 1983, CBS brought this action to pierce the corporate veil and collect on the judgment from Diners Club International, Inc., the corporate parent of CBI. The district court concluded that

the corporate veil should not be pierced and directed entry of judgment in favor of defendants. 802 F.Supp. 1006.

On the evidence in this record, interpreted in the light of *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir.1991), the finding of the district court that the corporate veil should not be pierced was clearly erroneous. Accordingly, we reverse and remand with a direction to the district court to enter judgment in favor of CBS.

■■■ The parties agree that New York law guides our decision. Generally speaking, a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both. 1 Fletcher Cyc. Corp. § 43 (perm. ed. 1990). While "New York is reluctant to pierce corporate veils * * *" *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985), exceptions are made in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary. Recently, Judge Cardamone of this court carefully analyzed New York law on piercing the corporate veil:

> Liability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties. *See Itel Containers Int'l Corp. v. Atlanttrafic Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir.1990) ("New York law allows the corporate veil to be pierced *either* when there is fraud or when the corporation has been used as an alter ego.") (emphasis in original); *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979) ("Because New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, *or* when the corporation has been so dominated by an individual or another corporation ..., and it separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego."); *cf. Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980) (in federal maritime law "The prerequisites for piercing a corporate veil

are ... clear ...: [the defendant] must have used [the corporation] to perpetrate a fraud or have so dominated and disregarded [the corporation's] corporate form that [the corporation] primarily transacted [the defendant's] personal business rather than its own corporate business.").

*Passalacqua*, 933 F.2d at 138–39.

■ Determining whether a parent corporation's control and domination requires the court to disregard the corporate form calls for examination of a number of factors involving the interactions between parent and subsidiary. Some of them were described by Judge Cardamone in *Passalacqua* as follows:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua*, 933 F.2d at 139.

■ Ultimately, the question in any particular case is whether, in light of the circumstances, "the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form— the need to protect those who deal with the corporation." *Id.*

■ Applying these principles to this case, we conclude that the breach of the franchise agreement that caused CBS to suffer the

damages found by the arbitrators was the result of domination and control of CBI by its parent, Diners Club. The reasons for our conclusion become clear from a review of the uncontested facts.

Even before it was acquired by Citicorp, Carte Blanche Corporation (CBC) had run its credit-card business in two parts. The domestic portion was operated through CBC itself. In 1972 CBC established a wholly owned subsidiary, CBI, for its international operations. CBC owned the Carte Blanche trademark and authorized CBI to grant and administer franchises, including use of the Carte Blance trademark, in areas outside the United States. Among the eight authorized franchises, one of them, executed in August 1980, granted to CBS, a Singapore corporation, the right to market and service Carte Blanche credit cards in Malaysia, Singapore, and Brunei. CBS paid $100,000 for the franchise and was required to pay to CBI one-half of one percent of the gross charge volume generated by its card members.

Citicorp had acquired CBC in 1978. Seeking to further extend its travel and entertainment business, Citicorp in June 1981, also acquired Diners Club. At that point Citicorp owned both Carte Blanche and Diners Club, and both of them had both domestic and overseas credit-card operations. Such duplication needed correction. In an internal memorandum from Richard S. Braddock dated June 22, 1981, on the subject of "T & E Cards—ORGANIZATION", Citicorp stated that it would "immediately begin to address the task of assimilating Diners into the Citicorp family, and we will begin to integrate certain activities of Carte Blanche and Diners in order to create a competitive T & E card business." Pei Chia, who had been president of Carte Blanche, was to continue in that capacity and also was to assume "the functional title of Chairman and Chief Executive Officer of Diners Club, Inc., for the United States and Canadian pieces of the Carte Blanche and Diners Club businesses."

Seymour Flug who had been chairman of the board of Diners Club, was to have "the functional position of Chairman and Chief Executive Officer for the overseas Carte Blanche and Diners Club businesses."

Finally, the memo established "a small steering committee to define the future strategic direction for our T & E card business." The committee included Flug, the president of Diners Club, Inc., the president of Diners International (yet to be named), and Chia.

Chia appointed Axel Neubohn to be the "key executive" for the steering committee. Neubohn had already developed a plan and strategy "to merge the 8 franchises where both Carte Blanche and Diners Club have independent operations." Neubohn pointed out in a memo of June 11, 1981, that "a decision has to be made on what we do with the Carte Blanche name. My original strategy was based on the assumption that Carte Blanche would be positioned as an upscale card leveraging on Diners Club distribution network."

Because of the dismal earnings record of CBI, the decision was made to "wind down" CBI's operations. The other franchisees agreed to terminate their franchises, but CBS refused to be bought out, and thus became the sole remaining franchisee. CBI continued to provide services to CBS under the franchise agreement, but it closed down its California operation and transferred all of its functions to the Diners Club offices in Denver. By the end of 1983, CBI had no separate offices, officers, books, or bank accounts. CBS's franchise was serviced solely by Diners Club employees. From 1981 until after defendants' breach of the franchise agreement, Flug was chairman of both Diners Club and CBI. Significant business during that period was conducted by Flug, but in the name of Diners Club, not CBI.

For example, section 5.10 of the franchise agreement required that CBI approve all of CBS's advertising. Shortly after CBS had refused to be bought out, it submitted a request for approval of some advertising material. By letter dated November 25, 1981, Flug confirmed his disapproval of the proposed advertising copy. But his letter was on the stationery of Diners Club International and was sent by Flug as Chairman of the Board.

Another, far more telling example: The dispute which gave rise to the arbitration

arose when 50 percent of the stock of CBS was sold to MBf Holdings Berhad Group of Companies. Flug believed that the transfer violated certain provisions of the franchise agreement, and he took the position that CBS was in default under the agreement. It was at that point that Diners Club refused to provide any further services under the agreement. By telex dated December 21, 1984, Flug stated "[t]his will constitute formal notice of default pursuant to the agreement." The bottom of the telex indicates that it was sent by "Seymour Flug, Chairman, Diners Club International". Thus, the act that breached the franchise agreement and caused CBS's damages was taken by Flug in the name of Diners Club, not CBI.

Both parties filed demands for arbitration; each claimed that the other had breached the agreement. CBS claimed that CBI had reduced essential services; CBI claimed that CBS had violated the agreement's provision against transfer of ownership to MBf. By interim award dated February 18, 1987, a majority of the arbitrators found that (a) CBI had materially breached the franchise agreement by withholding required benefits and services, and (b) the stock transfer by CBS to MBf was not a breach. A final award on January 25, 1988 gave to CBS damages of $8,993,638.20 plus interest. The award was confirmed, except for the rate of interest on post-judgments amounts due, by order of the United States District Court for the Southern District of New York dated April 8, 1988 and was affirmed by this court. See *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260 (2d Cir.1989).

Enforcement of that judgment against Diners Club under New York's law of piercing the corporate veil is not only appropriate, it is manifestly required in this case. CBI, of course, could have acted as a separate corporation, and from its organization in 1972 until mid–1981 it appears to have done so. The question, however, is whether it did so act in 1984 when the franchise agreement was breached, or whether, on the other hand, its actions were then dominated and controlled by its parent, Diners Club, and grandparent, Citicorp. Guided by the factors suggested by Judge Cardamone in *Passalacqua*, we note that at the time of the breach in 1984: (1) CBI had observed no corporate formalities for at least two years; (2) CBI kept no corporate records or minutes and had no officers or directors elected in accordance with its by-laws; (3) CBI had no assets, and its initial capitalization of $10,000 was insignificant when compared to the $7,000,000+ in loans that Diners Club and its predecessor, CBC, had advanced to finance CBI's business activity; (4) CBI had no separate offices or letterhead; (5) It had no paid employees; (6) It had no functioning board of directors; (7) All of CBI's revenues were put directly into Diners Club's bank account, and Diners Club paid all of CBI's bills; (8) CBI had no separate personnel or payroll; whatever services were provided to CBS from 1983 on came from full-time Diners Club employees; (9) CBI's revenues and marketing reports were not recorded independently, but were treated as part of Diners Club's revenues and were combined with Diners Club's statistics; and (10) Flug was the only person who functioned on behalf of CBI. He occupied the position of Chairman of the Board in a carryover status; at the same time, however, he was also Chairman of the Board of Diners Club. Flug was paid no salary by CBI. When passing on CBS's advertising request, Flug acted not in the name of CBI but of Diners Club. Indeed, when he gave formal notice of default under the franchise agreement, it was as Chairman of Diners Club, not CBI.

All this evidence, none of which is in dispute, compels the conclusion that, by the time of the breach, CBI had ceased to function as a separate entity, and its operations and assets had been absorbed into Diners Club.

We do not quarrel with the district court's finding that Flug in good faith believed, however erroneously, that CBS had breached the franchise agreement. Whether in his own mind he thought he was acting on behalf of CBI or Diners Club is not the question. As indicated by the discussion in *Passalacqua*, the factors that determine the question of control and domination are less subjective

than "good faith"; they relate to how the corporation was actually operated.

In short, just as there can be no doubt as to the power of Diners Club and Citicorp to control CBI's actions, there can be no question that the potential control and domination were actually exercised here. Most particularly, when Flug, as "Chairman" of Diners Club, actually caused the breach for which CBI was held liable in the arbitration, there was nothing of the CBI corporation except Flug's position as "Chairman" of CBI and the corporate shell, whose preservation may have had some lingering tax benefits for Diners Club. No bank accounts, offices, stationery, transactions, or any other activities were maintained or carried on in the name of CBI. When the arbitration was conducted, the attorneys who appeared for CBI addressed and sent their bills directly to Diners Club and were paid by Diners Club over a million dollars in fees for their services.

We conclude that, in the unique circumstances of this case, New York law requires enforcement of CBS's judgment directly against Diners Club. Accordingly, we reverse the judgment of the district court and remand with a direction to enter judgment in favor of CBS.