RIVERKEEPER, INC., Plaintiff,

v.

MIRANT LOVETT, LLC, as owners and operators of the Lovett Generating Station, Defendants.

No. 05–CV–2792 (CS).

United States District Court, S.D. New York.

Dec. 15, 2009.

Daniel E. Estrin, Karl S. Coplan, Pace Environmental Litigation Clinic, Inc., White Plains, NY, for Plaintiff.

Michael A. Oropallo, Hiscock & Barclay, LLP, Syracuse, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

SEIBEL, District Judge.

Plaintiff Riverkeeper, Inc. brought this action against Defendant Mirant Lovett, LLC ("Lovett"), as a citizen suit under the Clean Water Act. *See* 33 U.S.C. § 1365(a). Plaintiff alleges that Defendant violated the terms of its State Pollution Discharge Elimination System ("SPDES") permit by failing to timely implement environmental safeguards at a Lovett power station drawing water from the Hudson River. Now pending before this Court is Defendant's Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. 31.) For the reasons stated below, Defendant's Motion to Dismiss is granted in part and denied in part.

## I. *Background*

This action arises from a dispute between Riverkeeper, a non-profit corporation that identifies its mission as the effort to "conserve and enhance the biological integrity of the Hudson River and its tributaries and to protect the Hudson River's natural resources," (Complaint ¶ 8), and Lovett, which owned and operated the

Mirant Lovett Power Generating Station (hereinafter, the "generating station" or "plant") located in the Town of Tomkins Cove in Rockland County, New York (*id.* ¶ 11, 19). Riverkeeper alleges that Lovett operated its generating station in violation of SPDES Permit No. NY–0005711 (hereinafter, "SPDES Permit"). (*Id.* ¶ 11; Affidavit of Amy K. Kendall in Support of Defendant's Motion to Dismiss the Complaint (Kendall Aff.) Ex. 3.) Unless otherwise stated, the following facts are drawn from Plaintiff's Complaint (Doc. 1), and accepted as true for the purposes of Defendant's Motion to Dismiss.

Most of Plaintiff's 5,000 members live on or near the Hudson River, and "share a common concern about the quality of the Hudson River and its surroundings." (*Id.* ¶ 8.) Many of these members were served by Lovett's generating station, which utilized cooling water intake structures subject to the conditions of the SPDES Permit.[1] Under the permit, Lovett was required to implement the Gunderboom Marine Life Exclusion System ("Gunderboom" or "MLES") to protect marine life in the river and to monitor the exclusion rate of aquatic organisms, in order to minimize adverse environmental impacts pursuant to the Clean Water Act. (*Id.* ¶ 20.) The SPDES Permit required that Lovett implement the MLES by February 23 each year or "when ice conditions on the Hudson River allow[ed] for safe deployment, whichever is later." (*Id.* ¶ 21.) The latter date is known as the "ice-out date." (*Id.* ¶ 22.) Riverkeeper alleges that Lovett "consistently delayed ... implementing the MLES[] as well as monitoring the Exclusion Rate as required by [the] permit." (*Id.* ¶ 20.) In 2004, for example, Lovett allegedly failed

---

1. Although not alleged in the Complaint, the undisputed record shows that the plant was shut down in April 2008, was demolished in early 2009, and is no longer in operation.

(Second Affidavit of Jeffrey R. Perry in Support of Mirant Lovett's Motion to Dismiss the Complaint ("Second Perry Aff.") ¶ 4, Ex. C.)

to implement the MLES until April 30, despite ice conditions permitting safe deployment on or around February 23. (*Id.* ¶ 23.) Riverkeeper also alleges that ice conditions permitted safe deployment by February 2005, but Lovett had not, as of the filing of the Complaint in March 2005, deployed the MLES or conducted biological monitoring as required by the SPDES Permit.[2] (*Id.* ¶¶ 24–27.)

Lovett contends that the terms of the SPDES Permit were effectively modified by a consent order into which it entered with the New York State Department of Environmental Conservation ("DEC") on June 29, 2004. (Defendant's Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem") 5.) Under the terms of the consent order, the DEC imposed a $10,000 civil penalty upon Lovett for violating the SPDES Permit in 2004, and set a fixed deadline for installation of the Gunderboom MLES in subsequent years. (Kendall Aff. Ex. 4 (hereinafter, "2004 Consent Order").) Specifically, the Consent Order required MLES deployment by May 17 in 2004, and by April 20 in each subsequent year until the expected expiration of the SPDES Permit in 2008.[3] Lovett contends that the instant suit is barred under the Clean Water Act ("CWA" or the "Act"), which prohibits citizen suits when state or federal authorities have diligently prosecuted and caused the violations alleged in the citizen suit to cease without any likelihood of recurrence. Lovett further argues that the case has been rendered moot by the shutdown of the plant in 2008 (and its subsequent demolition in 2009) and the termination of the SPDES permit in 2009,

and that any of Riverkeeper's remaining claims for civil damages were discharged by the entry of a plan of reorganization in October 2007 following Lovett's bankruptcy.

## II. Discussion

### A. Standard of Review for a Motion to Dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal citations and quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 129 S.Ct. at 1950.

---

**2.** Plaintiff's Complaint was placed on the Court's suspense docket on April 20, 2005, due to Lovett's bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of Texas. (Doc. 5.) Lovett filed for bankruptcy on July 15, 2003, and emerged from Chapter 11 reorganization proceedings in October 2007. (Def.'s Mem. 3–5.)

**3.** In addition to the 2004 Consent Order, Lovett operated the generating station subject to the terms of a 2003 consent decree with the DEC and the State of New York that required Lovett to permanently discontinue the operation of "all units at the Facility by April 30, 2008, unless certain other contingencies took place." (Def.'s Mem. 7; Kendall Aff. Ex. 1.)

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R.Civ.P. 8(a)(2)).

*B. Clean Water Act*

 The Clean Water Act expressly prohibits discharge of any pollutant into navigable waters without an appropriate permit issued by the United States Environmental Protection Agency ("EPA") or under a federally approved state permit system, such as that pursuant to which the SPDES Permit was issued by the DEC. *See* 33 U.S.C. §§ 1311(a), 1342; N.Y. Envtl. Conserv. Law § 17–0801 (McKinney 2006). The Act further provides that "any citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of [the Act]." 33 U.S.C. § 1365(a).[4] This provision is limited, however, in that a citizen may not bring suit if a "State has commenced and

is diligently prosecuting an action" against the violator.[5] *Id.* § 1319(g). Thus, the Act permits citizen suits for violations of the Act only "absent enforcement action by the EPA or state agencies." *Conn. Coastal Fishermen's v. Remington Arms,* 989 F.2d 1305, 1311 (2d Cir.1993).

 "Citizen suits play an important role in the Act's enforcement scheme," and "[t]he citizen suit provisions were designed not only to 'motivate government agencies' to take action ... but also to make citizens partners in the enforcement of the Act's provisions." *Weiler v. Chatham Forest Prods.,* 392 F.3d 532, 536 (2d Cir.2004) (quoting *Wilder v. Thomas,* 854 F.2d 605, 613 (2d Cir.1988)). "The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities." *Atl. States Legal Found. v. Eastman Kodak,* 933 F.2d 124, 127 (2d Cir. 1991); *see N. & S. Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552, 555 (1st Cir. 1991) ("primary function" of citizen suits is "to enable private parties to assist in enforcement efforts where Federal and State Authorities appear unwilling to act," but "when it appears that governmental action under either the Federal or comparable State Clean Water Acts begins and is diligently prosecuted, the need for citizen[ ] suits vanishes."). A citizen suit brought pursuant to Section 1365 of the Act may not revisit the terms of "a settlement reached by competent state authorities without regard to the probability of a continuation of the violations alleged in its

---

**4.** A citizen suit may be filed for violation of "an effluent standard or limitation," 33 U.S.C. § 1365(a), which includes a SPDES permit, *see* 33 U.S.C. §§ 1365(f), 1342(b).

**5.** Prior to the 1987 amendment of the Act, the Second Circuit held that a consent order with a state agency did not bar a citizen suit under the CWA. *See Friends of the Earth v. Consol.*

*Rail Corp.,* 768 F.2d 57 (2d Cir.1985). Congress later limited Section 1365 by disallowing any civil action brought under section 1365 for an alleged violation of the Act "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection ..." 33 U.S.C. § 1319(g)(6)(A)(ii).

complaint. Nor may the citizen suit proceed merely for the purpose of further investigating and monitoring the state compromise absent some realistic prospect of the alleged violations continuing." *Eastman Kodak,* 933 F.2d at 127–128. Accordingly, citizen suits brought under the CWA must "be prospective in nature and must supplement, not supplant, state enforcement of the Act." [6] *Id.* at 127 (internal quotation marks omitted). Such a suit cannot, therefore, be maintained when competent state authorities diligently prosecute an action, thereby terminating a polluter's violations of the Act.

### C. This Suit is Not Barred by the Clean Water Act

 Lovett argues that the 2004 Consent Order effectively modified the SPDES Permit, bringing Lovett's untimely installation of the Gunderboom into compliance with the CWA and DEC regulations.[7] Plaintiff does not dispute that Lovett complied with the 2004 Consent Order but argues that the Consent Order cannot modify the SPDES, and that Lovett's post-February 23 or "ice-out" instal-

lation in 2004 and thereafter violated the SPDES.

Lovett asserts that the Second Circuit in *Eastman Kodak* held that a "citizen group ... [is] not entitled to challenge the terms of [a] ... settlement with NYSDEC because the purpose of citizen suits is to stop violations of the CWA which are not challenged by ... authorities." (Def.'s Mem. 21.) *Eastman Kodak,* however, involved a simpler fact scenario than the one at issue here. Although the Second Circuit ruled that citizen suits that seek to remedy wholly past violations "must be dismissed" when previous "state enforcement ... has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence," *Eastman Kodak,* 933 F.2d at 127, it did not hold that an agreement between a polluter and a state enforcement agency nullifies the terms and conditions set forth in an otherwise binding SPDES Permit or immunizes the polluter from suit regarding future violations. Nor did the court in *Eastman Kodak* declare that emissions permits could be unilaterally modified by a state enforcement agency without the public participation required for a formal permit modification. The

---

6. Although a citizen is prohibited from filing a lawsuit when the State is diligently prosecuting an action or has issued a final order, *see* 33 U.S.C. §§ 1319(g)(6)(A)(i), (ii), (iii), this limitation does not apply when "a civil action under [the citizen suit provision] of this title has been filed prior to commencement of an action under [the administrative enforcement] subsection." 33 U.S.C. § 1319(g)(6)(B). Here, Plaintiff filed the instant action in February 2005—more than six months after the DEC took corrective action against Defendant.

7. Although the record is typically limited on a motion to dismiss, the Court can consider the 2004 Consent Order for several reasons. First, the Court takes judicial notice of the 2004 Consent Order, as it is a matter of public record and acknowledged by both sides. *See In re Winimo Realty Corp.,* No. 09–CV–9307,

1998 WL 872500, at *3 n. 1 (S.D.N.Y. Dec. 15, 1998) (on appeal from bankruptcy court ruling, court may take judicial notice of consent order between party and DEC "which is a matter of public record, acknowledged by both sides, and bears directly on the issue."). Second, the Court is considering the 2004 Consent Order not for the truth of the assertions therein, but only for the fact that these assertions were made. *See* FED.R.EVID. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Third, the Court is not limited to the allegations contained in the Complaint when considering challenges to its jurisdiction. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (court may consider evidence outside pleadings in reviewing motion to dismiss for lack of jurisdiction).

questions are thus whether the DEC's consent decree purports to be a modification of the SPDES permit or merely an agreement not to enforce the terms of the permit, and if the former, whether such a modification would be valid.

As to the first question, the 2004 Consent Order itself contains no indication that it modified the SPDES Permit; rather, it represented an understanding between the parties "that the required time to deploy the MLES should be extended" (2004 Consent Order ¶ 10), and that the DEC would thus defer enforcement of the SPDES Permit. The 2004 Consent Order thus provided a "Compliance Schedule" with deadlines for deploying the MLES beyond those set forth in Lovett's SPDES Permit, and expressly provided that it would terminate upon satisfaction of certain conditions (namely, Lovett's payment of the civil penalty and compliance with the alternate schedule).[8] (*Id.* ¶ III.A.) The 2004 Consent Order spoke only to the DEC's enforcement of the SPDES Permit—not modifications to the Permit itself—and provided that although Lovett would be "release[d] ... from further liability" upon compliance, the DEC retained at all times the right to "reallege the violations listed in this order" or "seek issuance ... of a summary abatement Order." (¶ III.B.) Such language would be superfluous if the 2004 Consent Order operated to modify the SPDES Permit as Lovett contends. Settlements that merely provide for selective non-enforcement of per-

mits by a state regulatory agency, without more, do not bar citizen suits under the CWA seeking enforcement of the terms of such permits. *See Frilling v. Village of Anna*, 924 F.Supp. 821, 837–38 (S.D.Ohio 1996) (although consent order with state was an "agree[ment] not to enforce ... permit limitation ... [t]he government's failure to enforce specific ... limitations in the ... permit does not prevent [p]laintiffs from seeking to enforce them through a citizen suit"). Accordingly, Lovett's argument that the 2004 Consent Order modified, and brought Lovett into compliance with, the SPDES Permit is unavailing.[9]

Moreover, even if the 2004 Consent Order purported to modify the SPDES Permit, such a modification would appear to be invalid, as it does not appear that the DEC satisfied the public notice and participation requirements necessary to modify an SPDES permit. *See Waterkeeper Alliance, Inc. v. U.S. EPA*, 399 F.3d 486, 503 (2d Cir.2005) ("Congress clearly intended to guarantee the public a meaningful role in the implementation of the Clean Water Act."). Under both the Act and New York law, "[p]ublic participation in the development, revision, and enforcement of any ... limitation ... shall be provided for, encouraged, and assisted by the Administrator and the States." 33 U.S.C. § 1251(e); *see* N.Y. Envtl. Conserv. Law § 17–0703(2) ("Public hearings, on due notice, shall be conducted by the commissioner or by his designated representa-

---

**8.** Indeed, even the DEC's letter in response to Riverkeeper's notice of intent to sue is silent as to any modification of the SPDES Permit, instead characterizing the 2004 Consent Order as simply "set[ting] forth a time frame for deployment and operation of the MLES." (Kendall Aff. Ex. 5.)

**9.** Furthermore, the instant suit cannot be regarded as a prohibited collateral attack on the 2004 Consent Order, *see Solvent Chemical Co. ICC Industries, Inc. v. E.I. Dupont De Nem-*

*ours & Co.*, 242 F.Supp.2d 196, 217 (W.D.N.Y.2002) (assertion of environmental claims did not constitute impermissible collateral attack on consent decrees when consent decrees did not fully address "any response costs or other relief for the release of hazardous substances"), as Riverkeeper served Lovett and the DEC with notice of its intent to sue on March 29, 2004, three months before the 2004 Consent Order was executed by the Parties. (*See* Kendall Aff. Ex. 5.)

tive in connection with the issuance of any order or determination denying, revoking, continuing or modifying a permit ... unless the applicant ... waives said hearing in writing and ... [no interested party] request[s] ... a public hearing."); 6 N.Y. Comp.Codes R. & Regs. §§ 621.2(g), 621.7, 621.13 (procedural requirements, including public comment, for DEC permit modification). An action alleging violations of the CWA cannot be dismissed where the state enforcement agency, acting without the benefit of public input, attempts to modify a permit. *See Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co., LLC,* 531 F.Supp.2d 747, 755 (S.D.W.Va.2008) (allowing CWA claims against defendant to proceed because "there was no public notice and [p]laintiffs' ability to challenge the modification through state administrative channels was effectively eliminated"). Rather, such suits proceed on the terms of original permits whenever an attempt to modify the permit failed to comply with the necessary public participation procedures. *See Citizens for a Better Environment–Cal. v. Union Oil Co. of Cal. (UNOCAL),* 83 F.3d 1111, 1120 (9th Cir.1996) (state enforcement agency's attempted modification of permit with consent order ineffective when agency failed to comply with "federal and state regulations govern[ing] the modification of NPDES permits"); [10] *Proffitt v. Rohm & Haas,* 850 F.2d 1007, 1012 (3d Cir.1988) (stipulation with EPA staying enforcement of violations on certain permit conditions void because there was "no opportunity for public participation" and the applicable regula-

tions did not "permit dispensing with public notice when an amendment effects a substantial change in the terms of a permit")

The 2004 Consent Order is, therefore, most accurately—at least on this record—characterized as a settlement that: (1) fully addressed Lovett's failure to timely deploy the MLES in 2004, a "wholly past violation," *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60–61, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), for which Lovett was penalized; (2) included DEC's agreement not to enforce the ice-out date provision in the subsequent years, but; (3) neither purported to modify the SPDES Permit, nor could validly have done so; and (4) cannot preclude citizen suits enforcing that permit for years other than 2004. In short, insofar as Riverkeeper seeks damages resulting from Lovett's 2004 violation of the SPDES Permit, the suit is barred under the CWA. With respect to Lovett's violations of the SPDES Permit after 2004, however, the terms of the 2004 Consent Order only provide the DEC would not sue Lovett if the MLES was deployed by April 20 of each year, but do not modify or bar Riverkeeper's claims against Lovett for violations after 2004.

### D. The Suit is Moot to the Extent It Seeks Declaratory or Injunctive Relief

 Defendant contends that even if the 2004 Consent Order had not modified the SPDES Permit, Plaintiff's claims were

---

**10.** Defendant attempts to distinguish *UNOCAL* on the grounds that the court there found that the state enforcement agency did not impose a "penalty" as contemplated by the Act, because "the fairest characterization of the payment at issue is that it was ... a settlement made to avoid an enforcement action by the Regional [Water Quality Control] Board." *UNOCAL,* 83 F.3d at 1116. In this case, Lovett's payment was explicitly characterized as a penalty. (2004 Consent Order; Def.'s Mem. 19.) In any event, the distinction Defendant attempts to draw is immaterial where, as here and in *UNOCAL,* the state enforcement agency attempts to effectively modify a permit without satisfying public participation requirements.

rendered moot by the demolition of the plant and surrender of the SPDES permit in 2008. (Def.'s Mem. 8–9.) Courts may consider or refer to evidence outside the pleadings in resolving the jurisdictional issue of mootness. *See Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 161 n. 30 (2d Cir.2003); *Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002); *Lawal v. I.N.S.,* No. 94–CV–4606, 1996 WL 384917, at *1 (S.D.N.Y. July 10, 1996) (citing *Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991)). The standard for mootness has been described as "stringent." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). As the Supreme Court has stated:

> A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Id.* (internal quotation marks and alteration omitted). Thus, a claim "becomes moot when an event occurs that makes it impossible for a court to grant the plaintiff effectual relief even if he should prevail." [11] *Diaz v. Pataki,* 368 F.Supp.2d 265, 269 (S.D.N.Y.2005); *see Gwaltney,* 484 U.S. at 66, 108 S.Ct. 376 ("Longstanding principles of mootness ... prevent the maintenance of suit when there is no reasonable expec-

tation that the wrong will be repeated." (internal quotation marks omitted)). The Second Circuit has held that a plaintiff may continue to pursue relief under the Clean Water Act when "the terms of the settlement are such that a realistic prospect of continuing violations exists," but "[i]f no such prospect exists, the action should be dismissed as moot." *Eastman Kodak,* 933 F.2d at 128; *see* Affidavit of Jeffrey R. Perry in Support of Mirant Lovett's Motion to Dismiss the Complaint ("First Perry Aff.") ¶¶ 16–22.

Lovett has produced undisputed evidence that the generating station has been shut down and demolished. Riverkeeper responded that the case is not moot because even if the generating station was destroyed, Lovett retained its SPDES Permit and could conceivably recommence violating the Act. This was precisely the situation presented in *Laidlaw:* even though the *Laidlaw* facility was "closed, dismantled, and put up for sale, and all discharges from the facility permanently ceased," *Laidlaw,* 528 U.S. at 179, 120 S.Ct. 693, the Supreme Court declined to find the case moot because the *Laidlaw* defendant retained its permit and could have rebuilt the facility and again violated the Act. *Id.* Unlike the defendant in *Laidlaw,* however, Lovett has shown in its reply papers that it not only physically demolished the facility, but notified the DEC in January 2009 of its intent to surrender

---

**11.** This is not to say, however, that "a polluter's voluntary post-complaint cessation of an alleged violation will ... moot a citizen suit claim for civil penalties even if it is sufficient to moot a related claim for injunctive or declaratory relief." *Laidlaw,* 528 U.S. at 196, 120 S.Ct. 693 (Stevens, J., concurring). In filing this suit, Plaintiff sought both injunctive relief and civil penalties for Defendant's alleged non-compliance with the SPDES Permit. Thus, to the extent a plaintiff's claims are mooted for the purpose of injunctive or declaratory relief, such claims could survive

with respect to civil penalties. *See Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp.,* 993 F.2d 1017, 1020 (2d Cir.1993) ("A rule requiring dismissal of a citizen suit in its entirety based on a defendant's post-complaint compliance appears to conflict with the language of the [CWA] ... [because] a penalty suit would *always* become moot and a defendant would escape *all* liability if it could show, at any time before judgment, that the allegedly wrongful behavior could not reasonably be expected to recur." (internal quotation marks omitted) (emphasis in original)).

its SPDES Permit, and received in February 2009 the DEC's "approv[al of] the discontinuance of the ... SPDES Permit" for the generating station. (Second Perry Aff. Exs. A–C.) In a letter dated February 25, 2009, the DEC informed Lovett that its SPDES permit was discontinued, that "any future air emissions or discharge ... will require new Air and SPDES permits," and that operation of the generating station without new permits would constitute a violation subject to further enforcement action. (Second Perry Aff. Ex. C.) The last remaining operating unit at the plant was shut down on April 19, 2008, (First Perry Aff. ¶ 15, Ex. A), and the facility was disconnected from the power grid soon thereafter (*id.* ¶ 17).

The termination of the SPDES Permit, in conjunction with the complete demolition of the plant and cessation of all operations, demonstrates that Lovett can now neither legally (by permit) nor physically commit the wrongful conduct alleged in the Complaint. There is, therefore, no "realistic prospect of continuing violations," *Eastman Kodak,* 933 F.2d at 128, and it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." *Laidlaw,* 528 U.S. at 189, 120 S.Ct. 693. Accordingly, to the extent Plaintiff's Complaint seeks injunctive or declaratory relief, it is moot and must be dismissed.

### E. Lovett's Bankruptcy Bars any Civil Penalties Arising From Violations of the SPDES Permit Prior to October 2007

■ Riverkeeper also seeks civil penalties for Defendant's violations of the SPDES Permit. Although Riverkeeper's claims are moot to the extent they seek injunctive or declaratory relief in light of the demolition of the plant and Lovett's surrender of its SPDES Permit, its request for civil penalties for violations of the SPDES Permit are not moot. *See*

*Laidlaw,* 528 U.S. at 189, 120 S.Ct. 693. In light of Lovett's bankruptcy, however, any claims for civil damages resulting from violations that occurred during the pendency of Lovett's bankruptcy must be dismissed.

On July 3, 2003, Lovett filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. (Def.'s Mem. 3.) Plaintiff had actual notice of the bankruptcy filing, which it acknowledged in a stipulation filed with this Court on April 20, 2005. (Doc. 5.) On September 19, 2007, the Bankruptcy Court for the Northern District of Texas issued an order confirming Lovett's Chapter 11 Plan of Reorganization. Kendall Aff. Ex. 6 ("Confirmation Order"); *In re Mirant Corporation,* No. 03–46590, 2007 WL 2753277 (Bkrtcy.N.D.Tex. Sep. 19, 2007). The plan became effective on October 2, 2007, when Lovett emerged from bankruptcy. (Perry Aff. ¶ 13; Pl.'s Opp. 9.) The Confirmation Order "constitutes a judicial determination of discharge of all [Lovett's] liabilities," and provides that "such discharge shall void any judgment against Mirant Lovett ... at any time obtained to the extent it relates to a Claim discharged and operates as an injunction against prosecution of any action against Mirant Lovett or its property ... to the extent it relates to a discharged Claim." Confirmation Order 44; *see* 11 U.S.C. § 524(a)(2). The Confirmation Order also expressly enjoins those "who have been, are, or may be holders of discharged Claims against ... Mirant Lovett" from "commencing, conducting or continuing in any manner ... any suit, action, or other proceeding (including, without limitation, all suits, actions, and proceedings that are pending as of [October 2, 2007] ... which must be withdrawn or dismissed with prejudice)." (Confirmation Order ¶ 48.)

There is "little question that the definition of 'claim' in the Bankruptcy Code is very broad," and includes claims brought under the CWA, which are dischargeable in bankruptcy. *In re Chateaugay Corp.*, 112 B.R. 513, 520 (S.D.N.Y.1990), *aff'd*, 944 F.2d 997 (2d Cir.1991). Riverkeeper effectively concedes that claims arising prior to or during Lovett's bankruptcy have been discharged, but requests that the Court refrain from dismissing such claims while it "explor[es] the facts surrounding [Lovett's] bankruptcy." (*See* Pl.'s Opp. 21–22.) Further, Riverkeeper asserts that "[b]ecause many permit violations have occurred since [Lovett's] emergence from bankruptcy ... there will be little if any prejudice to [Lovett] if the Court declines to dismiss the claims for [Lovett's] pre-emergence CWA violations on this motion to dismiss." (*Id.*)

Plaintiff has adduced no authority in support of its argument that dismissal of its discharged claims "would be premature." (*Id.* 21.) Nor has the Court's own review of the law revealed any authority for allowing claims discharged in bankruptcy to survive merely to allow a party to conduct additional discovery. Moreover, Riverkeeper's failure to preserve claims it might have had against Lovett for penalties arising during or before the pendency of the bankruptcy cannot be cured through additional discovery. Riverkeeper is thus enjoined from pursuing those claims under 11 U.S.C. § 524(a)(2). The Confirmation Order had the effect of discharging and releasing Lovett from any causes of action (with certain specified exceptions that do not apply here) that arose prior to October 2, 2007, including Plaintiff's environmental claims, which are accordingly dismissed.

 This leaves, however, the question of whether any claims survive in view of Lovett's violation of its SPDES Permit in 2008. Erroneously assuming that the 2004 Consent Order had modified the SPDES Permit, Lovett terminated all operations of the plant on April 19, 2008, one day before the deadline set forth in the 2004 Consent Order. (First Perry Aff. ¶¶ 12, 14.) In light of the Court's ruling, above, that the 2004 Consent Order only addressed Lovett's 2004 violation of the SPDES Permit and DEC's future enforcement of the permit's time requirements for MLES implementation, but did not modify the permit itself, Lovett should have terminated operations or deployed the Gunderboom prior to February 23 or the "ice-out" date in 2008, which it did not. The Complaint adequately alleges continuing violations, that, at the time the lawsuit was brought, were "continuing or are reasonably likely to continue." (Compl. ¶ 28.) *See Gwaltney*, 484 U.S. at 57, 108 S.Ct. 376 (interpreting CWA to require that plaintiffs allege a state of "continuous or intermittent violation"); *Laidlaw*, 528 U.S. at 185–86, 120 S.Ct. 693 (civil penalties payable to the government may constitute redress for a plaintiff who faces threat of future injury from ongoing violations). Accordingly, to the extent the Complaint alleges ongoing violations lasting into 2008 (or an amended complaint could allege such a violation), such a claim for civil damages would survive Lovett's bankruptcy.

### F. Riverkeeper Has Standing to Bring this Suit

 A citizen suit may be brought under the CWA by "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Riverkeeper "has standing as an association ... on behalf of its members if: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of indi-

vidual members in the lawsuit.'" *Bldg. & Const. Trades Council of Buffalo v. Downtown Dev.*, 448 F.3d 138, 144 (2d Cir.2006) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). In assessing whether a plaintiff has standing, the Court is mindful of the "manner and degree of evidence required at the successive stages of the litigation." *Atl. States Legal Found. v. Babbitt*, 140 F.Supp.2d 185, 188 (N.D.N.Y.2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Although "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks omitted), the Supreme Court "has commented on the lowered bar for standing at the pleading stage, stating that 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Connecticut v. American Elec. Power Co., Inc.*, 582 F.3d 309, 333 (2d Cir.2009) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

■ The first, and only disputed, requirement for associational standing is that the organization's members "have standing to sue in their own right." To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an "injury in fact," (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### 1. Injury In Fact

■ In the context of an environmental suit, "the relevant showing for Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693. Thus, plaintiffs adequately allege injury in fact when they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). "[A]n allegation of injury in fact is generally adequately pleaded when an association asserts that the challenged actions resulted in injury by exposing its members to increased pollutants." *Bldg. & Constr. Trades Council of Buffalo*, 448 F.3d at 146 (internal quotation marks omitted). An allegation of "[a]ctual exposure to increased levels of [pollutants] at one's workplace," for example, "qualifies as an allegation of injury in fact." *Id.* (internal quotation marks omitted).

■ Defendant contends that Riverkeeper's Complaint "does not identify an alleged injury," and contains "no allegations that any specific member utilizes the area of the Hudson River near Lovett's Facility, or that Lovett's failure to install the [Gunderboom] . . . has harmed a member of Riverkeeper." (Def.'s Mem. 13.) Defendant further asserts that Plaintiff is "required to allege and ultimately prove that its members 'use the affected area' adjacent to the Lovett Facility and suffered a concrete injury as a result." (*Id.*) This unduly narrow view of standing would introduce a proximity standard into the "injury in fact" requirement.

Plaintiff has adequately pled "injury in fact." The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they [or their members] use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laid-*

*law,* 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Here, Riverkeeper has alleged that its members' interests, which include "fishing and boating, swimming, drinking water, and hiking" in and along the Hudson River, "are being, and will be, adversely affected by defendant's failure to comply with the requirements of the Clean Water Act" because the "quality of the Hudson River and its surrounding areas directly affects the health, recreational, aesthetic, commercial, and environmental interests of Riverkeeper's members." (Compl. ¶¶ 8, 10.) As such, Plaintiff has averred that its members derive at least recreational and aesthetic benefits from their use of the Hudson River, and that such benefits would be reduced by diminution of the health of the river as a result of Lovett's failure to satisfy the terms of its SPDES Permit, resulting in diminished biodiversity, disruption of the ecosystem, and the like.

### 2. Causal Relationship

 Plaintiff has also adequately pled a causal relationship between the injury and the challenged conduct. To satisfy this prong of the standing inquiry, the injury must be "fairly traceable" to the challenged activity. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The threshold requirement of "traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent … caused the precise harm suffered by the plaintiffs" in order to establish standing. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir.2000) *(en banc)* (citations and internal quotation marks omitted). "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area

of concern." *Id.* (citation and internal quotation marks omitted). Although there is no operative pollutant at issue here, Plaintiff has alleged that the SPDES Permit required Defendant to implement the Gunderboom and monitor the exclusion rate of aquatic life by dates certain (Compl. ¶¶ 21–27), and that it failed to do so (*id.*). Defendant's failure to satisfy the SPDES Permit requirements, with concomitant harm to the health of the river, would presumably injure Riverkeeper's members, who according to the Complaint derive recreational and aesthetic benefit from the Hudson River and surrounding areas. The Complaint thus sufficiently pleads that injury to Riverkeeper's members was "fairly traceable" to Defendant's failure to meet the requirements set forth in the SPDES Permit.

### 3. Redress

 Plaintiff also alleges that the identified injury—Defendant's failure to implement the Gunderboom and monitor the exclusion rate of aquatic organisms—would likely be redressed by a favorable decision. Defendant contends that no decision would or even could redress the alleged injury, as "operations at the [generating station] have been terminated, and … [it] is almost completely demolished." (Def.'s Mem. 15.) The Supreme Court has observed:

> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as

a consequence of ongoing unlawful conduct.

*Laidlaw*, 528 U.S. at 185–86, 120 S.Ct. 693. Although events may occur after the filing of the lawsuit that render an action moot, as they have here, courts assess whether standing exists based on the facts as they existed at the time the lawsuit was filed. *See Laidlaw*, 528 U.S. at 190–91, 120 S.Ct. 693. The fate of the generating station after the events in the Complaint and after the alleged injury is immaterial to the standing inquiry. Defendant does not contend that the generating station was demolished by March 11, 2005, the date that lawsuit was filed, or by February 23, 2008, the date the remaining viable violation began. (Def.'s Mem. 15.) Accordingly, as of the time the suit was filed, Plaintiff had an injury redressable by civil penalties.

### 4. Remaining Associational Standing Requirements

Defendant does not dispute, and the Court finds, that Plaintiff adequately alleges the remaining two associational standing requirements. First, Riverkeeper's mission is "to conserve and enhance the biological integrity of the Hudson River and its tributaries and to protect the Hudson River's natural resources," (Compl. ¶ 8), and its interests in filing the suit are doubtless "germane to ... [its] purpose." *Bldg. & Const. Trades Council of Buffalo*, 448 F.3d at 144. Second, there is no authority or argument before the Court that the relief requested, which includes penalties payable to the United States Treasury and costs including reasonable attorneys' fees, would require the participation of any individual Riverkeeper members in the instant action.

Accordingly, the Court finds that Riverkeeper has standing to bring suit.

### G. The 2003 Letter Agreement

 Lovett argues that a 2003 letter agreement with Riverkeeper (*see* Kendall Aff. Ex. 2 (hereinafter, "2003 Letter Agreement")) "include[d] a covenant by Riverkeeper *not to file* a citizen suit alleging violations of any federal or state laws with respect to that portion of Permit Condition 10A concerning the installation of the Gunderboom to reduce the number of entrained organisms by eighty percent (80%)." (Def.'s Mem. 2 (emphasis in original).) The relevant portion of the 2003 Letter Agreement states:

> Riverkeeper will not file or provide resources or information to support the filing of any citizen suit against [Lovett] under federal or state law alleging any violation of federal or state environmental laws or regulations ... with respect to [Lovett]'s Compliance with that portion of special condition 10A of the Permit which requires the MLES to reduce the number of entrainable organisms by 80 per cent on an annual basis.

(Kendall Aff. Ex. 2 (emphasis added).) In other words, Riverkeeper gave up its right to sue Lovett if the MLES ended up reducing the number of entrainable organisms by only 79% (or any amount less than 80%). As Riverkeeper points out, it did not, in filing the Complaint, "seek to hold [Lovett] liable in this action for violating 'that portion of special condition 10A of the Permit which requires the MLES to reduce the number of entrainable organisms by 80 percent on an annual basis.'" (Pl.'s Opp. 11.) Rather, Riverkeeper sought "to hold [Lovett] liable for violating *other* conditions of its CWA permit, namely, [Lovett]'s failure to timely install the required MLES each year and to timely perform specified biological monitoring required by the permit." (*Id.*; *see* Compl. ¶¶ 20–27.) Defendant's assertion that this provision would preclude Riverkeeper from enforcing any permit requirement condition set forth in condition 10A of the SPDES Permit would render the words "that portion of Special Condition 10A that requires

..." superfluous. Moreover, as Riverkeeper also points out, shortly below the above-quoted language, Riverkeeper expressly reserved its right to enforce Lovett's responsibility to satisfy "any other condition of the permit...." (2003 Letter Agreement 2.) Accordingly, the 2003 Letter Agreement did not bar Riverkeeper from bringing this suit against Lovett.

*H. The DEC is Not an Indispensable Party*

■ Lovett's final argument for dismissal of this case is that Riverkeeper has failed to join the DEC as an indispensable party. *See* Fed.R.Civ.P. 19. Lovett contends that the DEC is a necessary and indispensable party because its participation would be "required for a full resolution of the matters raised in this Action." (Def.'s Mem. 22.) A party is necessary if, in its absence, "the court cannot accord complete relief among existing parties," or the party has an interest relating to the subject of the action and its absence may impair or impede its ability to protect that interest or leave other persons at risk of incurring multiple or inconsistent obligations. Fed.R.Civ.P. 19(a). If a necessary party cannot be joined for practical or jurisdictional reasons, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed...." Fed.R.Civ.P. 19(b).

As discussed above, the purpose of the CWA's citizen suit provision is to ensure enforcement of federal environmental requirements and to "stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities." *Eastman Kodak*, 933 F.2d at 127. The CWA plainly confers to citizens an opportunity to step in and sue alleged violators when government agencies fail to act. *See id.* There is no authority, in the CWA or elsewhere, nor any factual basis, suggesting that the allegedly delinquent governmental enforcement agency is an indispensable party. *See Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir.1976) (EPA not a necessary party in Clean Air Act citizen suit); *Or. State Pub. Interest Research Group, Inc. v. Pac. Coast Seafoods Co.*, 341 F.Supp.2d 1170, 1178–80 (D.Or.2004) (in CWA suit seeking enforcement of NPDES permit, state agency that had recommended enforcement action on same issues was not an indispensable party); *Student Pub. Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F.Supp. 1479, 1484 (D.N.J.1985) ("no reason why complete relief cannot be accorded in the absence of the federal and state agencies" in citizen suit seeking enforcement of NPDES permit).

\*　　\*　　\*

For the foregoing reasons, the Complaint is dismissed as to all but Plaintiff's claims for civil damages resulting from Lovett's alleged 2008 violation of the SPDES Permit.

III. *Conclusion*

For the reasons set forth above, Defendant's Motion to Dismiss is granted in part and denied in part. Plaintiff's Complaint is dismissed except to the extent it: 1) alleges (or can be amended to allege) violations of the SPDES Permit occurring after October 2007; and 2) seeks civil penalties. The Clerk of Court is respectfully directed to terminate the pending motion (Doc. 31). The parties are directed to appear for a status conference on Jan. 16, 2010 at 11:15 am.

**SO ORDERED.**